# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBIN D. ANDERSON, | : | CIVIL NO. 1:12-CV-02173 |
| | : | |
| Plaintiff, | : | |
| | : | (Chief Judge Conner) |
| v. | : | |
| | : | |
| PENNSYLVANIA STATE POLICE, | : | |
| *et al.*, | : | (Magistrate Judge Schwab) |
| | : | |
| Defendants. | : | |

## <u>REPORT AND RECOMMENDATION</u>

In this civil action, proceeding *via* an amended complaint, the plaintiff, Robin Anderson ("Anderson"), an African-American female, alleges that her now-former employer, defendant Pennsylvania State Police ("PSP"), through its managers, supervisors, agents, and employees, engaged in a pattern and practice of unlawful race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S. § 955(a), *et seq.* Pending before the Court is the defendants' motion for summary judgment. For the following reasons, we recommend that the defendants' motion be granted in part and denied in part.

I.     **Background and Relevant Procedural History.**

Anderson initiated this lawsuit by filing a *pro se* complaint on October 31, 2012.  *Doc.* 1. Several months later, after the defendants had been served, counsel entered an appearance on Anderson's behalf.  *See Docs.* 5 & 10.  Thereafter, on May 9, 2013, Anderson filed a counseled amended complaint, *Doc.* 13, naming the following five defendants: (1) the PSP; (2) Frank Noonan ("Noonan"), a Colonel with the PSP[1]; (3) Michael Shevlin ("Shevlin"), the Chief Information Officer of the PSP; (4) Jerry Lenington ("Lenington"), the Director of the Project and Contract Management Division in the Bureau of Information Technology at the PSP; and (5) Janice Brzana ("Brzana"), a Project Manager for the PSP.  Based on the defendants' alleged racial discrimination and retaliatory conduct, Anderson raises the following claims: Count I – race discrimination against the PSP, in violation of Title VII; Count II – race discrimination against all defendants in violation of the PHRA; Count III – retaliation against the PSP, in violation of Title VII; Count IV – retaliation against the PSP in violation of the PHRA; and Count V – race discrimination and aiding-and-abetting against all defendants, in violation of the PHRA.   Among other remedies, Anderson seeks injunctive relief, compensatory damages, and an award for punitive damages.

---

[1]     After the lawsuit was filed, Noonan became the Commissioner of the PSP.

On June 20, 2013, the defendants answered the amended complaint, *Doc.* 17, and one year later, discovery closed.  *See Docs.* 28 & 32.  After the discovery period had closed, the defendants timely filed a motion for summary judgment along with a statement of facts, a brief-in-support, and corresponding exhibits. *Docs.* 36, 37, 38 & 43.  On October 20, 2014, Anderson responded to the motion by filing a brief-in-opposition, a counterstatement of material facts, her own non-responsive statement of facts, and corresponding exhibits.  *See Doc.* 51.  The defendants filed a reply brief along with a counterstatement of facts to Anderson's non-responsive statement of facts.  *See Doc.* 56.  The motion, having been fully briefed by the parties, is ripe for disposition on the merits.

## II.     <u>Legal Standard</u>.

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The purpose of summary judgment is to avoid unnecessary trials in cases where the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant.  *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).  Thus, the rule functions to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

3

trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(quoting Fed.R.Civ.P. 56(e) advisory committee's notes on 1963 amendments).   In doing so, "'a judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1886 (2014)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *see Doe v. Luzerne County*, 660 F.3d 169, 175 (3d Cir. 2011)(A district court "'may not … weigh the evidence or make credibility determinations' because 'these tasks are left for the fact finder.'")(quoted case omitted).

From a procedural standpoint, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145–46 (3d Cir. 2004).  If the moving party meets its burden with a properly supported motion, the burden then shifts to the non-moving party to present specific facts that show there is a genuine issue for trial. *Anderson*, 477 U.S. at 248.

A clear focus on where the burden of proof lies as to the factual issue in question is crucial.  Depending on which party bears the burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own.  Thus, when the non-moving party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the

nonmovant's claim. *See, e.g., Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)("[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file."). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element material to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322-23.

With respect to factual disputes, they are only material if they might affect the outcome of the suit under the applicable law, and they are genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49 (1986). Accordingly, a court should grant summary judgment where the nonmovant's evidence is merely colorable, conclusive, or speculative. *Id.* at 249–50. Accordingly, there must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. *Id.* at 252; *see also Matsushita*, 475 U.S. at 586. As the Third Circuit has often stated,

5

"summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *E.g., Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). Furthermore, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial. *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 (3d Cir. 1999). But, again, in determining whether a factual dispute is genuine, the Court must focus on which party bears the burden of proof at trial on the factual issue in dispute, because that party must produce sufficient evidence to support the factual claim. Moreover, in endeavoring to resolve a summary judgment motion, the Court must "consider all evidence in the light most favorable to the [non-moving party]." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

## III.    **Statement of Facts.**[2]

Anderson began working for the PSP on March 6, 2006, as an IT Generalist Administrator ("ITGA") 1.  *Doc.* 37 at ¶¶ 1, 7.  When she started, Anderson was first assigned to the Market Place office.  *Id.* at ¶ 8.  The ITGA 1 position, for which Anderson was hired, was classified in the A3 bargaining unit.  *Id.* at ¶¶ 10. While her position was designated as a project-management position, Anderson was not hired to supervise staff.  *Id.* at ¶¶ 11-12.  Anderson, instead, was hired to provide "maintenance and support" to PSP projects such as the Commonwealth

---

[2]       As we are required to do at this stage, we will present the facts in the light most favorable to Anderson, the non-moving party.  Furthermore, we note our disagreement with the defendants who argue that under Local Rule 56.1, Anderson's additional, non-responsive statement of facts should be wholly stricken.  *Doc.* 56 at 15-16.  In this regard, while the Court has stated that Local Rule 56.1 "does not provide for a non-moving party to file his own statement of material facts, but instructs the non-moving party how to properly respond to the movant's statement of material facts," *Sash v. Hogsten*, No. 07-475, 2009 WL 249649, at *2 (M.D. Pa. Feb. 2, 2009)(Rambo, J.), we do not interpret that statement as foreclosing a non-movant from ever filing a separate, non-responsive statement of material facts.  Rather, we interpret the Court's statement and the text of the Local Rule as operating to merely prohibit a non-moving party from *solely* relying upon a separate, non-responsive statement of material facts in opposing a motion for summary judgment.  *See generally, Dreibelbis v. Young*, No. 06–2055, 2007 WL 4344120, at *2 (M.D. Pa. Dec. 10, 2007) (Jones, J.) (finding that plaintiff, through counsel "utterly failed to oppose Defendants' Motion [for summary judgment]," and stating that "based on the plain language of Local Rule 56.1, Plaintiff's filing of his own Motion and Statement of Material Facts is not technically sufficient to either oppose Defendants' Motion or deny Defendants' Statement of Material Facts.").  Thus, Anderson's additional, non-responsive statement of facts should not be stricken given that her *counterstatement* of facts is generally responsive to the defendants' motion for summary judgment, and we, therefore, will take the non-responsive statement of fact under consideration.

Law Enforcement Assistance Network ("CLEAN"), which is "the most critical law enforcement tool for [the] PSP and Pennsylvania law enforcement agencies in the [Commonwealth]."  *Id.* at ¶¶ 9, 13; *see Doc.* 38-4 at 28.  At the same time, during the interview process, Anderson was told that her position could "grow" into a supervisory role.  *See Doc.* 38-4 at 28-29.

### A. Anderson's First Complaint with the Pennsylvania Human Relations Commission (the "PHRC") and the Equal Opportunity Commission (the "EEOC") (January 2007).

On January 31, 2007, approximately ten months after she was hired by the PSP, Anderson filed a complaint with the PHRC (No. 200604560), and dually filed with the Equal Employment Opportunity Commission (the "EEOC"), alleging that the PSP treated similarly situated Caucasian employees better than her.  *Doc.* 37 at ¶ 14; *see Doc.* 38-5.   In this complaint, her first with the PHRC, Anderson specifically complained that she was denied training opportunities, excluded from meetings, denied an Alternative Work Schedule, and verbally counseled for taking earned leave time and for the tone of her emails.  *Id.* at ¶ 15; *Doc.* 38-5.   On October 1, 2009, a representative from the PHRC recommended a finding of "No Probable Cause;" thereafter, the PHRC closed the case for "Insufficient Evidence to Support Probable Cause."  *Doc.* 51-1 at ¶ 16.

**B. Anderson's Second Complaint with the PHRA and EEOC (April 2008).**

On April 21, 2008, Anderson dually filed a second complaint with the PHRC (No. 200705865) and EEOC, claiming that she was discriminated against on the basis of race and also subject to retaliation. *Doc.* 37 at ¶ 17; *see Doc.* 38-6. More precisely, Anderson complained that she was denied participation in staff meetings, denied in-person meetings with her supervisor at the time, Kathy Feldgus ("Feldgus"), that Feldgus removed many of Anderson's job duties, that she (i.e. Anderson) was denied training and was counseled regarding the PSP's leave policies. *Doc.* 37 at ¶ 18; *see Doc.* 38-6. On October 1, 2009, a representative from the PHRC recommended a finding of "No Probable Cause;" thereafter, the PHRC closed the case for "Insufficient Evidence to Support Probable Cause." *Doc.* 51-1 at ¶ 19.

Later in Fall 2009, after Anderson had filed the two complaints, Anderson then complained to Brzana, who had become Anderson's immediate supervisor in September 2009, and Lenington, the Director of the Project and Contract Management Division in the Bureau of Information Technology, *via* email that she feared being demoted in the event of a desk audit. *Doc.* 38-12 at 17. More precisely, Anderson wrote, "due to my lack of work, I do not interact with people within my own division…. I do not even know any people due to the lack of inclusion (both internal to my division and / or other PSP personnel)…." *Id.*

9

Anderson also complained that she was "deeply concerned" about her current job duties and the job description that she recently received. *Id.* Moreover, Anderson wrote, "after 30 years of Commonwealth employment, I have never been treated like I have been treated here and will no longer sit and allow you to ruin my reputation, limit my knowledge and belittle the skill sets that I currently posses (sic)." *Id.*

Lenington responded to Anderson's email, assuring her that both he and Brzana had no intentions of setting her up for a demotion or to ruin her reputation. *Id.* Furthermore, Lenington informed Anderson that they wanted nothing but the best for her. *Id.* As well, Lenington provided suggestions for Anderson in preparation for a desk audit, and requested that Anderson meet with Brzana to go over what should be covered during the audit. *Id.*

### C. Classification Review of Anderson's Position (December 2009).

Around December 2009, the Bureau of Human Resources conducted a "classification review" (or desk audit) of Anderson's position "[i]n response to the Commonwealth's Information Technology Occupation Study and management's belief that [her] position may be more appropriately classified as Project Manager 1 [("PM1")]." *Doc.* 38-12 at 19. According to Anderson, during said audit, she was unable to answer why her role was different than that of her co-workers. *Id.* at 5. As well, the findings of the audit revealed that others' roles in Anderson's

10

assigned projects "reduced the ability of [her] to perform the full scope of PM1 responsibilities.   Much of [her] involvement . . . appears to have involved participating in (and perhaps coordinating) meetings and preparing and revising required PM documentation.  These functions, although part of a successful PM, do not meet the definition of PM1." *Id.* at 20.  Thus, in the end, the evidence gathered during the audit demonstrated that Anderson's duties as an ITGA1 were not consistent with the duties of a PM1.  *Id.*

### D. Anderson's Application for a Position with the Pennsylvania Department of Agriculture.

At some point between May 25 and June 8, 2010, Anderson applied for a position as an ITGA 2 with the Department of Agriculture.  *Doc.* 37 at ¶ 20.  Anderson was not interviewed or hired for the position.  *Id.* at ¶¶ 21-22.  Anderson subsequently filed a complaint with the State Civil Service Commission (the "SCSC"), alleging that she was discriminated against when the Department of Agriculture did not select her for an interview.  *Doc.* 51-1 at ¶ 23.  After a hearing, however, the SCSC determined the Department of Agriculture did not discriminate against her; instead, the SCSC found that Anderson was not interviewed because she was not within the "rule of three" under the Civil Service Act, which was the recruiting method used by the Department for the position to which Anderson had

applied.[3]  *See Doc.* 38-7 at 11.  Moreover, the SCSC found that Anderson was not eligible for selection to the position under any of the four recruiting methods.  *Id.*

### E. Access to the PSP's Intranet ("iNet") Link.[4]

On July 7, 2010, Anderson sent Brzana an email asking why she did not have access to a link on the PSP's iNet.  *Doc.* 38-8.  According to Anderson, she used to have access to the link, in that she at least knew the link pointed to "IT Standards in the Division."  *Doc.* 38-9 at 4.  Brzana and other IT staff, however, never had access to the link.  *See id.* at 4.  Furthermore, based upon the emails submitted as exhibits, Brzana sought the assistance from other IT staff members about the issue.  *Id.* at 2-4.  Apparently, the reason Anderson could not access the link was because of her role as Web Content Administrator.  *See id.* at 2.  Thus, while Anderson could see the link, and make "PSPINET changes for PMO," she did not have access to the page itself.  *Id.*

---

[3]    Section 602 of the Pennsylvania Civil Service Act, 71 P.S. § 741.602, provides in relevant part that "[i]f a vacant position is to be filled, an appointing authority may request the director to issue an appropriate certification of eligibles. . . . If the vacant position is to be filled from an employment or promotion list, the appointing authority shall select a person who is among the three highest ranking available persons on the certification of eligibles."

[4]    The exhibits relied upon by each side fail to shed much, if any light, on what happened here.  Nevertheless, as we are required to do, we will read the exhibits in the light most favorable to Anderson, to the extent we understand the contents of the exhibits.

**F.  EEOC Charge No. 530-2010-02912 (August 2010).**

On August 12, 2010, Anderson filed a discrimination charge with the EEOC, in which she alleged retaliation and that the PSP's racially "discriminatory behavior continued" after she had filed the two previous complaints with the PHRC.  *Doc.* 51-1 at ¶ 28.  More specifically, Anderson alleged that she had less desirable accommodations, a limited workload with limited tools and resources, and no employees to supervise.  *Doc.* 37 at ¶ 29.  As an example, Anderson claimed that she was only given access to tools related to her part of the project while four other, white co-workers assigned to the same project had access to tools relating to the entire project.  *Doc.* 38-10 at 4.  Anderson further complained about not being included in meetings or considered for promotion.  *Doc.* 37 at ¶ 29.  As an example, Anderson set forth that Brzana informed her not to attend future "ITR" meetings.  *Doc.* 38-10 at 4-5.  In the end, however, on August 2, 2012, the EEOC dismissed Anderson's complaint because it (i.e. the EEOC) could not conclude that the information it obtained established a violation of statutes.  *Doc.* 37 at ¶ 30.

**G. Removal from the Pennsylvania-Instant-Check System ("PICS") Project.**

In Fall 2010, Anderson became the project manager for the PICS project. *Doc.* 37 at ¶ 31.  While Anderson was the project manager, Captain Janet McNeal ("McNeal"), a client on the PICS Project, made informal, off-the-record

13

complaints about Anderson to Lenington and Brzana.  *Doc.* 51-1 at ¶ 32.  McNeal complained about Anderson's ability to schedule meetings, lack of leadership, lack of competency, and indecisiveness.   McNeal further expressed concern over funding and time management.  *Doc.* 37 at ¶ 33.  McNeal, though, did not voice her concerns to Anderson nor did she have a meeting with Anderson to address the concerns.  *Doc.* 38-2 at 59, 64.  Furthermore, McNeal had drafted a letter regarding her concerns in April 2011, which was emailed to Lieutenant Troy Lockhaiser ("Lockhaiser"), the business lead on the PICS project.   *Doc.* 38-16 at 37.  Lockhaiser, however, did not immediately send the letter to Lenington; instead, he waited until August 2011.  *Id.*  According to Lockhaiser, he waited to send the letter to Lenington primarily because no one had asked for any correspondence and he believed that the project would progress after April.  *See id.*

Despite McNeal's complaints, Brzana noted in her December 13, 2010, interim Employee Performance Review ("EPR") of Anderson, that Anderson's "materials produced … for the PICS [project] demonstrate[d] [her] knowledge of project management methodology."  *Doc.* 38-3 at 28.  Brzana also noted that Anderson's work was of "good quality and timeliness," and that her work was "planned to meet the volume and timeliness required."   *Id.* at 28, 29.  Nevertheless, Brzana noted that Anderson had "difficulty building good relationships with co-workers."  *Id.* at 31.

Similarly, in Anderson's annual EPR, dated April 11, 2011, Brzana noted that Anderson "quickly" produced the initial documents for the PICS Project and that Anderson's work was "planned to meet the volume and timeliness required for projects." *Id.* at 37, 38. Furthermore, Brzana noted: "The materials produced [by Anderson] to date for the PICS rewrite project demonstrates that [she] has knowledge of project management methodology." *Id.* at 37. In the same EPR, however, Brzana also noted that there were concerns about Anderson's productivity and the quality of the work products. *Id.* at 37. Brzana further provided that Anderson was to be "encouraged to foster communications with co-workers by talking in an appropriate tone and [to be] sensitive to other's perspectives." *Id.* at 39. Similarly, in Anderson's August 2011 interim review, Brzana noted:

> [Anderson] seems to be making an effort to keep the PICS rewrite project on target and to supply a quality product. She has worked with the Technical Writer to develop a draft of business and technical requirements to provide a starting point for discussions and to keep the project on schedule.

*Id.* at 46.

In the end, the clients requested that Anderson be removed from the PICS Project based on their concerns that the Project was not "moving as well as it should've been moving as a result of the management of the project." *Doc.* 37 at ¶ 34; *Doc.* 38-16 at 37. Consequently, on August 3, 2011, Anderson was removed

from the PICS Project. *Doc.* 37 at ¶ 34; *see Doc.* 51-3 at 32. As well, in light of the PICS-clients' complaints about Anderson's performance, she was removed from the Bureau of Criminal Investigation's GIS Project.[5] *Doc.* 38-2 at 254-55. Thereafter, Anderson was given four other assignments: grant research, writing procedures for the vendor fingerprint process, working with the "BLCE" to place an application on "the network," and reviewing the "BLCE AVL" program. *Doc.* 37 at ¶ 36.

### H. SCSC Appeal No. 26766 (September 2010).

On September 27, 2010, Anderson filed an appeal with the SCSC, in which she complained that she was discriminated against on the basis of her race and in retaliation for having previously filed complaints with the PHRC and EEOC. *Doc.* 51-1 at ¶ 38; *Doc.* 38-12 at 3. More precisely, Anderson complained that she was being discriminated against by Lenington, Shevlin[6], and Brzana in that they allegedly isolated her from IT and business operations in 2007, removed all work responsibilities from her, refused to provide her with a performance evaluation, failed to provide her with training, failed to consider her for promotions, and treated her "as though she were a secretary." *Id.* On January 18, 2011, the PSP

---

[5]     The GIS Project was an "intelligence mapping project." *See Doc.* 38-2 at 254-55.

[6]     With the PSP, Shevlin served as a Chief Information Officer 2, and he began his term of service in 2008.

moved to dismiss SCSC Appeal No. 26766 on the basis that Anderson had been given the requested EPR. *Doc.* 37 at ¶ 53. The SCSC, however, denied the PSP's motion to dismiss on the basis that Anderson still had not received an *annual* EPR. *Id.* at ¶ 54.

## I. Anderson's *Interim* EPR (December 2010).

The PSP's policy requires that supervisors complete performance reviews "at least annually." *Doc.* 51-1 at ¶ 39. The PSP's review policy further lists a number of requirements that supervisors must meet before completing an EPR, including the requirement that supervisors supervise the subordinate employee for at least 90 calendar days. *Id.* at ¶ 41. Brzana, however, did not become the unit supervisor until September 2009. *Doc.* 37 at ¶ 40. As such, she decided against reviewing the employees under her supervision, including Anderson, until their annuals were scheduled to come around again. *Id.* Brzana took this action because she wanted a sufficient amount of time to assess the employees' work. *Id.* Nevertheless, once the human resources division became aware that Anderson was not receiving annual evaluations, action was taken to ensure she was evaluated. *Id.* at ¶ 41.

On December 13, 2010, after human resources became aware that Anderson was not being evaluated and after her September 2010 SCSC appeal, Brzana provided Anderson with an interim EPR. Brzana gave Anderson an overall rating

of "Satisfactory."[7]  *Id.* at ¶¶ 43-44.  Brzana was generally complimentary toward Anderson's knowledge, but she noted that Anderson should work on improving her communications skills and professional relationships.  *See id.* at ¶¶ 45-46.  As such, Brzana gave Anderson a "needs improvement" rating for her communications skills.  *Doc.* 38-3 at 28.  All other ratings were at or above the "satisfactory" level.  *See id.* at 27-30.

## J. Closed-Door Meeting with Shevlin, Lenington, and Brzana (December 2010).

On December 17, 2010, Anderson attended a meeting with Shevlin, Lenington, and Brzana to review a charter.  *Doc.* 37 at ¶ 47.  According to Anderson, during that meeting, Shevlin and Lenington slammed doors, pounded on a desk, and stood over her.  *Id.* at ¶ 48; *Doc.* 38-13 at 2.   Following the meeting, on January 25, 2011, Brzana issued a written reprimand to Anderson for *her* (i.e. Anderson's) conduct during the same meeting.  *Doc.* 38-3 at 11-12.  The written reprimand stated that, during the closed-door meeting, Anderson was "argumentative, refused to accept responsibility for omissions and oversights in the GIS Intelligence Charter, and acted in an insubordinate manner by abruptly leaving

---

[7]      On the EPR forms discussed in this Report, an examiner could insert marks rating an employee at any of five designated performance levels – "outstanding," "commendable," "satisfactory," "needs improvement," and "unsatisfactory (respectively from highest to lowest) – on any of seven individual job factors and overall.  In addition, the EPR forms provided additional space for the optional inclusion of commentary explaining each rated factor.

18

the meeting before it was concluded." *Id.* Anderson, however, abruptly left the meeting because she was "in fear of what [Shevlin, Lenington, and Brzana] might do to [her] within closed doors. . . ." *Doc.* 38-17 at 3. Nevertheless, the written reprimand notified Anderson that her actions violated the PSP Rules of Conduct for Employees and stated that it would be retained in Anderson's Official Personnel Folder for two years. *Doc.* 37 at ¶¶ 51-52; *Doc.* 38-3 at 11. Anderson did not request a review of the written reprimand because Lenington was the reviewing officer. *Doc.* 38-17 at 3.

### K. Anderson's First Annual EPR (April 2011).

As mentioned, *supra*, on January 18, 2011, the PSP moved to dismiss SCSC Appeal No. 26766 on the basis that Anderson had been given the requested EPR. *Doc.* 37 at ¶ 53. The SCSC, however, denied the PSP's motion to dismiss on the basis that Anderson still had not received an "annual" EPR. *Id.* at ¶ 54.

Thereafter, on April 11, 2011, Anderson received an annual EPR from Brzana, with an overall rating of "satisfactory." *Id.* at ¶ 55. Indeed, in four out of six job factors, Anderson received a "satisfactory" rating. *Doc.* 38-3 at 37-38. Moreover, with respect to her job knowledge and skills, Anderson received a "commendable" rating. *Id.* at 37. Furthermore, Anderson received a "needs improvement" rating with respect to her communication skills. *Id.*

Despite receiving an overall "satisfactory" rating, Anderson filed an appeal with the SCSC, complaining that the EPR was discriminatory and in retaliation for the previous complaints that she had made.  *See Doc.* 38-15; *see also Doc.* 38-17 at 3.  On June 15, 2011, the SCSC denied Anderson's appeal primarily because Anderson did not "indicate[] acts, which, if proven, would [have] constitute[d] discrimination. . . ." *Doc.* 38-15

### L. Anderson's Second Interim EPR (August 2011).

Two months after the SCSC had denied Anderson's appeal regarding her April 2011 Annual EPR, she received an interim EPR with an overall "needs improvement" rating.  *Doc.* 37 at ¶ 58.  Again, Anderson received a "commendable" rating for her job knowledge and skills.  *Doc.* 38-3 at 43.  Moreover, Anderson received a "satisfactory" rating for her initiative and problem solving skills, in addition to her work habits.  *Id.* at 43-44. Anderson, however, received a "needs improvement" rating for her work results, communication skills, and interpersonal relations.  *Id.* at 43-44.  In addition to the comments already noted, *supra*, Brzana also noted that "[w]hile leading the PICS [project], [Anderson's] verbal and non-verbal language have . . . been noted as detached, which has affected the willingness of the team to work cooperatively with her." *Id.* at 46.

### M. EEOC Charge Number 530-2011-2332.

On October 20, 2011, Anderson again filed charges of racial discrimination and retaliation with the EEOC. *Doc.* 37 at ¶ 74. Anderson's EEOC complaint stemmed from the December 2010 meeting, *supra*, and her belief that she was retaliated against by Brzana, Shevlin, and Lenington for having filed previous complaints of unfair treatment. *See Doc.* 38-17 at 2-3. With respect to Anderson's retaliation claim, in particular, she claimed that her April 11, 2011, EPR, in which she received an overall "satisfactory" rating, was retaliatory in that it arose immediately after complaining about, among other things, having never before received a performance evaluation. *Id.* at 2. On October 19, 2012, the EEOC determined that the evidence did not demonstrate discrimination or retaliation. *Doc.* 37 at ¶ 78.

### N. Anderson's Off-duty Conduct.

On November 1, 2011, Anderson was the driver in a hit-and-run crash. *Doc.* 37 at ¶ 59. An internal affairs investigation into the crash concluded that Anderson had struck four cars in Harrisburg, abandoned her vehicle, and then contacted Susquehanna Township Police to file a stolen vehicle report. *Id.* at ¶ 60. Anderson later admitted that she filed a false report. *Id.* Anderson was subsequently charged with several crimes, and ultimately found to be in violation of Administrative Regulation ("AR") 4-6, Sections 6.03(A) and (A)(3), relating to rules of conduct

21

for employees.  *Id.* at ¶ 61.  As a result of violating AR 4-6, Anderson was suspended without pay for five workdays, beginning on February 6, 2012.  *Id.* at ¶ 62.

**O. Anderson's Third Interim EPR (December 2011).**

On December 23, 2011, almost two months after the hit-and-run crash, Anderson received an interim EPR with an overall rating of "needs improvement." *Id.* at ¶ 63.  In particular, Anderson received a "needs improvement" rating with respect to her job knowledge and skills.  *Doc.* 38-3 at 63.  Anderson received the same rating with respect to her communication skills, in addition to her initiative and problem solving skills.  *Id.* at 63-64.  With respect to her work results and interpersonal relations, Anderson received an "unsatisfactory" rating.  *Id.* Last, with respect to her work habits, Anderson received a "satisfactory" rating.  *Id.* at 64.

**P.  Anderson's Second Annual EPR (April 2012).**

Ten days before Brzana completed Anderson's second annual EPR, Anderson had emailed Brzana stating in pertinent part that: "It is very unfortunate that someone at my level and with the skillsets that I have, has been isolated and have been provided disparate treatment and racial discrimination to the point that goals and objectives are missed."  *Doc.* 51-3 at 22.  On April 27, 2012, 10 days later, Anderson received a second, annual EPR, with an overall "unsatisfactory"

rating. *Doc.* 37 at ¶ 64.   In the April 2012 EPR, Brzana then noted in the same EPR that Anderson was not taking ownership of assigned projects, adhering to timelines, communicating in a positive or constructive manner, or carrying out her duties effectively.  *Id.* at ¶ 65.   The steering committee's meeting minutes, from March 17 to August 4, 2011, do not reflect that Anderson was presenting a problem to the PICS project, however.  *See Doc.* 51-3 at 34-51.   Yet, based upon the overall "unsatisfactory" rating in the annual EPR, Anderson was issued a Level 1 discipline letter in lieu of a one-day suspension.  *Doc.* 37 at ¶ 66.   The Level 1 discipline letter carried the same weight for progressive discipline purposes as a one day suspension, but it had no impact on Anderson's pay, seniority or other benefits.  *Id.* at ¶ 69.

## Q. Anderson's Appeal of the April 2012, Annual, EPR.

On April 27, 2012, Anderson appealed her annual EPR and the Level 1 discipline letter to the SCSC.  *Id.* at ¶ 70.   The issues before the SCSC were: (1) whether the performance evaluation or the Level 1 discipline were affected by discrimination in violation of the Civil Service Act, and (2) whether the Level 1 discipline was imposed for cause sufficient under the Civil Service Act.  *Id.* at ¶ 71.   Following a hearing, where Anderson was represented by counsel, the SCSC dismissed Anderson's appeal, sustaining the content of the EPR and Level 1 discipline.  *Id.* at ¶ 72.

### R. Anderson's Miscellaneous Complaints.

Overall, throughout Anderson's employment with the PSP, her rate of pay was never reduced, she was never demoted, and she never lost benefits. *Doc.* 37 at ¶ 82. Anderson complained, however, that she was assigned fewer projects than her co-workers and that her projects were minor in comparison. *Id.* at ¶ 79. After Anderson expressed her displeasure regarding the type and volume of her projects, she was assigned to the PICS project. *See Doc.* 38-4 at 35. According to Anderson, the PICS project was "more desirable." *Id.* In addition to complaining about her assignments, Anderson requested more exposure to the business operations. As a result, Anderson was assigned to a project that exposed her to the business area. *Id.* at 35-36. Anderson further felt that she had been excluded from work meetings, resulting in her having less knowledge than her fellow co-workers. *Doc.* 37 at ¶ 83. Yet, Anderson admits that there was no need for her to attend meetings given her assignments. *See Doc.* 38-4 at 30.

### S. Anderson's Workplace Locations.

While working for the PSP, Anderson was first assigned to the Market Place Office, then to the Hillcrest Office, and finally to the PSP's Headquarters. *Doc.* 37 at ¶ 85. At each location, Anderson's work space was situated with other IT staff members, including those with the same classification. *Id.* at ¶ 86; *see generally, Doc.* 38-19. At headquarters, specifically, Anderson did not think she was

24

physically isolated from other workers. *Id.* at ¶ 87.  At each location, managers with supervisory authority primarily had a "better" workplace than Anderson. *Doc.* 38-4 at 28.  Anderson, while not responsible for supervising staff, was hired to a management level position, *Doc.* 37 at ¶¶ 1, 7, 10, 11-12, but only to provide maintenance and support to PSP projects.  Nevertheless, Anderson asserts that she was not provided with an office or an outside cubicle because she did not have any "direct reports".  *Doc.* 51-1 at ¶ 86.

### T. Comparators.

The only employees Brzana supervised were Anderson, Mindy Solomon ("Solomon"), John Jones ("Jones"), and Allen Wolfgang ("Wolfgang").  *Doc.* 37 at ¶ 89.  Jones was the same classification as Anderson: an ITGA 1 at pay grade nine. *Id.* at ¶¶ 90-92.  Jones, however, supervised two people as he was primarily in charge of facilitators, meaning he had some supervisory authority, and may have managed small projects.  *Doc.* 38-2 at 215-16.  Wolfgang, on the other hand, was an ITGA 2 at pay grade eight.  *Doc.* 37 at ¶¶ 94-95.  In addition, Solomon, a PM1, was at pay grade nine.  *Id.* at ¶¶ 96-97.

## IV. <u>Discussion</u>.

Anderson raises the following claims in her amended complaint: (1) Count I – race discrimination against the PSP, in violation of Title VII; (2) Count II – race discrimination against all defendants in violation of the PHRA; (3) Count III –

retaliation against the PSP, in violation of Title VII; (4) Count IV – retaliation against the PSP in violation of the PHRA; and (5) Count V – race discrimination and aiding-and-abetting against all defendants, in violation of the PHRA. *See Doc.* 13. According to the defendants, however, they are entitled to summary judgment on each of Anderson's claims for the following reasons: (1) Anderson cannot prove a *prima facie* case of discrimination; (2) the PSP, alternatively, had legitimate non-discriminatory reasons for its actions; (3) Anderson cannot prove a *prima facie* case of retaliation; (4) a portion of Anderson's Title VII claims are time-barred under the "300-Day Rule"; (5) Anderson's state law claims should be dismissed because the Court lacks subject-matter jurisdiction over them; and (6) Anderson, alternatively, cannot establish a state-law claim for aiding and abetting under the PHRA. *See Doc.* 43.

**A. Anderson's Title VII Claims against the PSP.**

As mentioned, Anderson complains that she was the victim of disparate treatment and workplace retaliation, on the basis of her race, and in violation of Title VII. Anderson also appears to raise a hostile-work-environment claim under Title VII in Count I, despite the fact that there is no express mention of the claim in the amended complaint. The PSP does not challenge whether the latter claim was sufficiently pleaded in the amended complaint; rather, in its motion for summary

judgment, the PSP addresses all claims on the merits.   We will address these claims *seriatim*.[8]

We also emphasize here that in the employment-discrimination context, "the burden of persuasion on summary judgment remains unalterably with the employer as movant."   *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).   Therefore, "[t]he employer must persuade [the Court] that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor." *Id.* (citing *Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200, 201-02 (3d Cir. 1987)).

### 1.  The 300-Day Rule.

As an initial matter, we address the PSP's argument that Anderson's Title VII claims are partially time-barred under the 300-Day Rule.   *Doc.* 43 at 39-41.

---

[8]       Since "courts … generally interpret the PHRA in accord with its federal counterparts," *Kelly v. Drexel Univ.* 94 F.3d 102, 105 (3d Cir. 1996), the recommended dispositions with respect to the substance of Anderson's Title VII claims should apply equally to her related PHRA claims.   *See also, Whitaker v. Holy Family Social Services*, 309 F. App'x 654 (3d Cir. 2009)(applying equally the disposition of plaintiff's Title VII claims to his claims under the PHRA); *Farzan v. Vanguard Group, Inc.*, 582 F. App'x 105, 107 (3d Cir. 2014)(citing *Kelly*, 94 F.3d at 105, in a case involving retaliation claims brought under Title VII and the PHRA).   Thus, a ruling on Count I should apply equally to Count II, and likewise for Counts III and IV.   The parties do not disagree with this result.   *See Doc.* 43 at 12 n.6; *Doc.* 51 at 12 n.1.

In a deferral state such as Pennsylvania, a plaintiff is required to file a Title VII charge of discrimination with the EEOC within 300 days of the alleged unlawful practice - the 300-Day Rule. *Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 165 (3d Cir. 2013)(citing 42 U.S.C. § 2000e-5(e)(1)).   Here, it is undisputed that Anderson filed EEOC Charge No. 530-2010-02912 on August 12, 2010, and Charge No. 530-2011-02332 on October 20, 2011.   Given the timing of these two EEOC Charges, only discrete discriminatory acts[9] that occurred on or after October 16, 2009, and December 24, 2010, respectively, are actionable.   *Id.*

Discriminatory acts that are not individually actionable, however, may be aggregated to make out a hostile-work-environment claim under the continuing-violation doctrine; "such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Id.* (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)(citing *Morgan*, 536 U.S. at 105)).   A hostile-work-environment claim, in turn, "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice'" and "cannot be said to occur on any particular day." *Mandel*, 706 F.3d at 165 (quoting *Morgan*, 536 U.S. at 115-17).   Thus, "[t]o demonstrate a continuing violation, the plaintiff must show that all acts which

---

[9]   "Discrete acts include, for example, 'termination, failure to promote, denial of transfer, or refusal to hire.'"   *Mandel,* 706 F.3d at 165 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).

constitute [a] claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Id.* at 166 (citing *Morgan*, 536 U.S. at 122).

To aid in distinguishing between the occurrence of isolated acts of discrimination and a persistent, ongoing pattern, courts within the jurisdictional confines of the Third Circuit consider the subject matter and frequency of the underlying acts. *Id.* at 166-67.[10] Furthermore, the Third Circuit has instructed district courts to closely scrutinize the underlying discrimination claims to assess whether acts within the limitations period and those outside of the same period are properly related. *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 484-85 (3d Cir. 1997).

Here, the PSP argues that Anderson's Title VII claims are partially time-barred under the 300-Day Rule. Specifically, the defendants focus on the alleged acts relating to the December 17, 2010, closed-door meeting and alleged acts by Feldgus or Lenington occurring before October 16, 2009. *Doc.* 43 at 39-41.

In response, Anderson concedes that only discrete discriminatory acts occurring within the relevant limitations periods are actionable. *See Doc.* 51 at 8.

---

[10]     In *Mandel*, 706 F.3d at 166-67, the Third Circuit recognized that there is no longer a permanency requirement under the continuing-violation doctrine and, to that end, the Supreme Court's decision in *Morgan* partially superseded two of the court's opinions – i.e. *West v. Philadelphia Electrical Co.*, 45 F.3d 744 (3d Cir. 1995) and *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476 (3d Cir. 1997) – to the extent it adopted *Berry v. Board of Supervisors*, 715 F.2d 971 (5th Cir. 1983).

Anderson, however, contends that the continuing-violation doctrine applies to the acts that the PSP contends are time-barred. *Id.* at 8-12. Specifically, Anderson argues that the underlying claim relating to the December 17, 2010, closed-door meeting should not be time-barred, even though it falls outside of the limitations period, because said meeting, where she was yelled at and felt intimidated, evidences a pattern or practice of retaliation similar to her claims of retaliation in both the August 12, 2010, and October 20, 2011, EEOC Charges. *Id.* at 11. As to the acts of Feldgus and Lenington, occurring before October 16, 2009, Anderson also argues that she has demonstrated that the harassment she allegedly endured was more than the occurrence of isolated or sporadic acts of intentional discrimination in that many of the acts outside of the limitations period involved similar conduct by the same individuals that occurred within the limitations period. *Id.* at 11-12.

We turn first to the December 17, 2010, closed-door meeting. In pertinent part, in the October 20, 2011, EEOC Charge, Anderson complained that she felt as though she was being subjected to harassment and retaliation for having filed other complaints of discrimination in 2010. *Doc.* 38-17 at 2. As an example, Anderson set forth in the EEOC Charge that she was harassed and retaliated against in that she was yelled at during the closed-door meeting with Shevlin, Lenington, and

Brzana, and subjected to other acts of retaliation and harassment, including being issued a written reprimand.  *See id.*

In evaluating whether the closed-door meeting is an isolated act that is time-barred, we initially recognize that the written reprimand was issued within the limitations period and resulted from the same closed-door meeting.  Moreover, while the acts are different in substance, they are both tied to the same basis i.e., retaliation and harassment, as complained of by Anderson in her EEOC Charge – namely that she had filed other complaints of discrimination in 2010.  In addition, the written reprimand was issued less than one month from the date of the closed-door meeting.  Consequently, we find that the acts occurring at the closed-door meeting should not be deemed untimely, even though Anderson cannot point to other instances, within the limitations period, where she was yelled at, because the closed-door meeting and written reprimand appear to be a part of the same alleged unlawful employment practice.

Regarding any acts engaged in by Feldgus, however, we agree with the defendants that they should be deemed untimely.  In the August 12, 2010, EEOC Charge, Anderson complained that after she had filed discrimination claims with the PHRC in 2007 and 2008, she was reassigned to a different area, but discrimination persisted.  *Doc.* 38-10 at 4.  In addition, Anderson complained that she had less desirable accommodations than her counterparts; she had a limited

workload with limited tools and resources; and she did not have anyone to supervise. *Id.* From there, Anderson shifted gears in her EEOC Charge and jumped to June 2009, where she was under the supervision of Lenington. *See id.* And then, Anderson went further, by complaining about events in June and July 2010; events that occurred after Brzana had already become Anderson's direct supervisor. Given the contents of Anderson's EEOC Charge, coupled with the lack of evidence demonstrating that Feldgus had any further involvement with Anderson once Lenington, and Brzana for that matter, had become her supervisor, any acts involving Feldgus that form the basis of Anderson's Title VII claims should be deemed untimely. *See Ferguson v. Merck & Co., Inc.*, No. 05-0451, 2008 WL 205224, at *18 (E.D. Pa. Jan. 23, 2008)("[A]lthough there may have been some overlap in the actions, for the most part they were perpetrated by independent supervisors that acted independently over different time periods, which demonstrates isolated events rather than a persistent, ongoing pattern….")(cited case omitted). This same result should be reached with respect to any acts engaged in by Lenington, prior to October 16, 2009, since Brzana had become Anderson's direct supervisor in September 2009.

### 2. Disparate Treatment Discrimination.

In relation to the substance of Anderson's Title VII claims, in Count I, Anderson claims that she was the subject of disparate treatment on the basis of her race, in violation of Title VII. *Doc.* 13 at 11. According to Anderson, race-based discrimination can be inferred here through the adverse employment actions she allegedly endured, including, but not limited to the receipt of written reprimands, being suspended, and not being promoted. *Id.* As well, the amended complaint includes allegations that race-based discrimination can be inferred here through the following employment actions, which Anderson deems adverse: (1) not being assigned to the same duties as similarly-situated Caucasian employees; (2) not being permitted to supervise staff while similarly-situated Caucasian employees were so permitted; (3) not receiving a "normal" workload in comparison to similarly-situated Caucasian employees; (4) not being included in department meetings to which similarly-situated Caucasian employees were invited, and, therefore, being uninformed of department resources and protocol; (5) being isolated from co-workers in a cubicle while similarly-situated Caucasian employees were given offices on the same floor as their co-workers; (6) not being provided with necessary tools to complete assignments unlike similarly-situated Caucasian employees; (7) not being provided with regular annual evaluations unlike similarly-situated Caucasian employees; and (8) not being promoted, in

contrast to similarly-situated Caucasian employees.  *Id.* at ¶¶ 42, 43-44, 45-46, 47-49, 60-51, 83-84.

Generally, under Title VII's anti-discrimination provisions, it is unlawful for an employer to discriminate against any individual with respect to "compensation, terms, conditions, or privileges of employment" or to "deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of the individual's race. 42 U.S.C. § 2000e–2(a).  "Title VII is central to the federal policy of prohibiting wrongful discrimination in the Nation's workplaces and in all sectors of economic endeavor." *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2522 (2013).  Disparate-treatment discrimination, a form of intentional discrimination outlawed under Title VII, is proven by either using direct evidence of an intention to discriminate or using indirect evidence from which a court can infer an intention to discriminate. *C.A.R.S.*, 527 F.3d at 364.

Direct evidence is "evidence that proves an ultimate fact in the case without any process of inference." *Morgan v. York City School District*, No. 07-1211, 2009 WL 5111792, at *3 n 6 (M.D. Pa. Dec. 16, 2009)(quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 930 (3d Cir. 1997)).  "An employer who discriminates 'will almost never announce a discriminatory animus or provide employees or courts

with direct evidence of discriminatory intent.'" *Id.* (quoting *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999)).

In this case, we have found no evidence of record to suggest that Anderson relies on direct evidence in support of her discrimination claim; much less, the existence of any direct evidence to suggest that she has cleared the "high hurdle" for those plaintiffs who wish to establish a *prima facie* case of discrimination using direct evidence. *See id.* (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)); *see also, Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir. 1994)("[To succeed on direct evidence, the evidence must be] so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production."). Therefore, we are required to use the "familiar" *McDonnell Douglas* burden-shifting framework to analyze Anderson's Title VII discrimination claim. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this burden-shifting framework:

> [T]he employee must first establish a *prima facie* case. If the employee is able to present such a case, then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision. If the employer is able to do so, the burden shifts back to the employee, who, to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination.

*C.A.R.S.*, 527 F.3d at 364.

To establish a *prima facie* case of disparate treatment, a plaintiff must typically demonstrate that: (1) (s)he is a member of a protected class, (2) (s)he was qualified for the position, job, or duty at issue, (3) (s)he was subjected to an adverse employment action, and (4) the adverse action was taken under circumstances giving rise to an inference of unlawful discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999). "[T]he elements … must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination." *Geraci v. Moody-Tottrup, International, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996). Moreover, the Supreme Court has cautioned that the *prima facie* requirement for making a Title VII claim "is not onerous" and poses "a burden easily met." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). In essence, "[t]he *prima facie* phase of discrimination litigation 'merely serves to raise a rebuttable presumption of discrimination by eliminating the most common nondiscriminatory reasons for the employer's treatment of a plaintiff." *C.A.R.S.*, 527 F.3d at 365 (quoting *Burdine*, 450 U.S. at 253-54 (internal quotations omitted)).

In opposing the PSP's motion for summary judgment, Anderson argues that she can demonstrate a *prima facie* case of discrimination. To that end, it is undisputed that Anderson, as an African–American, is a member of a protected class. *See Tucker v. Thomas Jefferson Univ.*, 484 F. App'x 710, 712 (3d Cir.

36

2012).   The PSP, however, focuses its Rule 56 motion on whether the actions alleged by Anderson, if they occurred as alleged, were sufficiently adverse and whether the evidence gives rise to an inference of discrimination.   *See Doc.* 43 at 20-21, 29.

To establish an adverse employment action in the *prima facie* case, which the PSP contends Anderson cannot do, a plaintiff must show "[a] tangible employment action constitut[ing] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits . . . .   A tangible employment action in most cases inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62 (1998); *see also Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (defining an adverse employment action as "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment").

In evaluating this element of the traditional *prima facie* case, we recognize that other than the time Anderson was suspended in 2011, her pay was not withheld or reduced; she was never demoted; nor did she lose benefits.   Thus, direct economic harm was generally not inflicted upon Anderson as a result of the allegedly adverse employment actions.   Anderson argues, however, that those

37

actions, including the 2011 suspension, were serious enough to have altered her conditions and privileges of employment to be considered adverse under Title VII. *See Doc.* 51 at 14.

Regarding the written reprimand Anderson received in 2011, the Court is unaware of any evidence supporting her proposition that it constituted a significant change in the terms or conditions of her employment.   Indeed, the written reprimand was not permanently affixed to Anderson's personnel file; rather, the reprimand remained in her file only for a period of two years.  Accordingly, in this instance, it cannot be said that the written reprimand qualifies as having a presumptive effect on the terms or conditions of Anderson's employment.  *See Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001), *overruled in part on other grounds by White*, 548 U.S. 53 (2006).  No reasonable juror, therefore, could find as a matter of law that the reprimand was an adverse employment action.[11]

---

[11]     To the extent Anderson also complains that Shelvin's act of yelling at her constitutes an adverse employment action, we find that the claim should fail as a matter of law.  *See Smalls v. Allstate Ins. Co.*, 396 F.Supp.2d 364, 371 (S.D.N.Y. 2005)("[B]eing yelled at, receiving unfair criticism … do not rise to the level of adverse employment actions … because they [do] not have a material impact on the terms and conditions of [] employment.")(quoted case omitted); *Russ v. Van Scoyoc Associates, Inc.*, 122 F.Supp.2d 29, 32 (D.D.C. 2000)(finding on summary judgment in a Title VII case involving a claim of sex discrimination that "it is clear that merely being yelled at by your supervisor does not rise to the level of an adverse employment action.")(citing *Ellerth*, 524 U.S. at 761); *see also, Leget v. Henderson*, No. 99-3636, 2001 WL 43615, at *2, *6 (S.D.N.Y. Jan. 18, 2001)("The fact that plaintiff felt 'threatened' is insufficient to establish an adverse employment action.").

Next, Anderson cannot show that she suffered an adverse employment action because she was not permitted to supervise others.  Viewing the evidence in the light most favorable to Anderson, as we are required to do, the evidence to which we are directed plainly demonstrates that she was hired to work at the PSP solely for the purpose of providing "maintenance and support" on PSP projects. There is also no other evidence of which we are aware demonstrating that her position so evolved and that she was subsequently denied supervisory authority. Given that Anderson was not hired with supervisory authority, coupled with the lack of evidence demonstrating that she obtained such authority, there is presently no dispute to be had about whether the denial of supervisory authority to Anderson was adverse.

We also fail to see how Anderson could possibly demonstrate a genuine dispute as to whether her office placements, or desk assignments, constituted an adverse action.  We have already found that Anderson's complaints reaching back to when Feldgus and Lenington were her supervisors are time-barred.  Also, in evaluating the claim, in its entirety, the evidence to which the Court has been directed demonstrates that Anderson was always seated with IT staff at each location.  Managers acting as supervisors appear to have been the only PSP employees with subjectively "better" accommodations.  Furthermore, while neither party points this out, the seating charts offered by the defendants as exhibits, *see*

*Doc.* 38-19, demonstrate that Anderson was always located near John Jones, another PSP employee classified as the same rank as Anderson -- an ITGA 1.[12]  As well, there is no evidence to demonstrate that Anderson's location at any of the offices to which she was assigned significantly impacted the terms or conditions of her employment.  Thus, no reasonable juror could find for Anderson on this basis either.

After scouring the record, we also conclude that no reasonable juror could find that Anderson's work assignments - or removal from certain assignments - and workload significantly altered the terms or conditions of her employment.  Although the work assignments, or loss thereof, may have been personally dissatisfying to Anderson, the PSP points out that she always remained an ITGA 1 and was consistently assigned to several major projects fitting her job description, one of which, the PICS Project, was considered by her as being "more desirable."  In other words, there is no evidence that Anderson's responsibilities were diminished so as to have significantly altered the terms or conditions of her employment.  Anderson also fails to direct the Court to evidence demonstrating that she ever applied for a promotion at the PSP, or that, if any opportunities for a

---

[12]   As we will later explain, however, Jones should not be considered as a true comparator because his job functions differed from Anderson's in that he was also in charge of facilitators, and, thus, had supervisory authority.

promotion were available, she was eligible for one.[13]   In the same light, Anderson

doesn't demonstrate how her non-attendance at meetings, at any time during her

employment or even once Brzana became her direct supervisor, significantly

altered her employment terms and conditions.   In fact, quite the opposite, Anderson

admitted at her deposition that she often had no meetings to attend because of her

work assignments.   As well, other than possibly affecting her personal desire to

obtain more knowledge about the PSP, or to learn about other work opportunities,

there is nothing in the record to suggest that her non-attendance at meetings had a

"serious or tangible" effect on her employment terms and conditions.

---

[13]   To the extent Anderson also complains that her poor performance ratings in certain EPRs constitute an adverse employment action, such a claim should fail as a matter of law. *See Williams v. Pennsylvania State Police – Bureau of Liquor Control Enforcement*, 108 F.Supp.2d 460, (E.D. Pa. 2000)("[A] poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment.   An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.")(quoting *Spears v. Missouri Dep't of Corrections & Human Resources*, 210 F.3d 850, 854 (8th Cir. 2000) and citing other cases).   Nowhere in either her Rule 56 brief or her (counter)statement of facts can we find supporting evidence to demonstrate that the terms or conditions of Anderson's employment were significantly altered, or that, for example, the ratings affected her ability to obtain a promotion – this is especially true since Anderson fails to point to evidence establishing that she ever applied for a promotion or that she was qualified for one.

Further, we harbor doubt, under the fourth element, whether a reasonable juror could find an inference of discrimination here.  The Court has been clear that "a plaintiff can satisfy the fourth element element in a variety of ways . . . ." *Morgan,* 2009 WL 5111792, at * 4.  In general, the fourth element focuses on whether the employer treated some people less favorably than others because of, among other things, their race.  *Pivirotto v. Innovative Sys.*, Inc., 191 F.3d 344, 352 (3d Cir. 1999).

Here, the only way Anderson seeks to satisfy the fourth element is by arguing and claiming that she was treated differently than similarly-situated Caucasian coworkers.  *See, e.g., Doc.* 13 at ¶ 95; *see also, Doc.* 51 at 15-16. "[W]hether an individual can satisfy the 'similarly situated' requirement triggers a fact-intensive inquiry based on a whole constellation of factors facing that individual employee."  *Morgan*, 2009 WL 5111792, at * 5 (quoting *Monaco v. American General Assur. Co.*, 359 F.3d 296, 306 (3d Cir. 2004)).  Under this approach, "a plaintiff must be similarly situated in all relevant respects to the individuals with whom she seeks to compare herself." *Oliver v. Clinical Practices of University of Pennsylvania*, 921 F.Supp.2d 434, 448 (E.D. Pa. 2013)(cited case omitted)). This entails a showing that the two employees dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would

42

distinguish their conduct or the employer's treatment of them for it. *See Morgan,* 2009 WL 5111792, at *5 (quoting *Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 603 (M.D. Pa. 2002) and citing *Red v. Potter*, 211 F. App'x 82, 84 (3d Cir. 2006)(per curiam)("[I]n order to show than an employee is 'similarly situated,' all of the relevant aspects of employment need to be nearly identical.")); *see also*, *Oliver*, 921 F.Supp.2d at 448 (same) (quoting *Opsatnik v. Norfolk Southern Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009)).

According to the PSP, Anderson has not produced any evidence that similarly situated employees outside of her protected class were treated differently than her under the same circumstances. *Doc.* 43 at 30; *Doc.* 56 at 27.  To the contrary, Anderson argues that she has met her burden and points to two exhibits also relied upon in her non-responsive statement of facts.  *See Doc.* 51 at 16; *accord id.* at 5 (defining the acronym "SUF" as "Plaintiff's Statement of Undisputed Facts").

The first exhibit relied upon by Anderson is an email exchange between her, Brzana, and Lenington.  *Doc.* 38-12 at 17; *see also, Doc.* 51-4 at ¶ 18.  In the email, Anderson primarily expressed concern about her job duties, job description, fear of a desk audit, and a feeling that she was being isolated from interaction with other, unidentified people. *See id.*  Additionally, Anderson stated in the email that "[o]ther people within the Project and Contract Management Division interact, but

due to my lack of work I do not interact with people within my own division." *Id.* In response to Anderson's email, Lenington conveyed to her that neither he nor Brzana had intentions of setting her up for a demotion or to ruin her reputation. *Id.* Moreover, Lenington provided Anderson with suggestions in preparation for a desk audit. *See id.*

The second exhibit relied upon by Anderson to support her argument on the fourth element is a copy of the PSP's findings from a desk audit that occurred after the previous email exchange "[i]n response to the Commonwealth's [IT] Occupation Study and management's belief that [Anderson's ITGA 1] position may [have been] more appropriately classified as a [PM 1]...." *See Doc.* 38-12 at 19; *see also, Doc.* 51-4 at ¶ 23. In relevant part, the findings of the audit demonstrated that Anderson's job duties were not consistent with the duties of a PM 1, and further provided that the findings were "in no way a reflection of [Anderson's] performance or abilities." *Id.* at 20. No comparators were referenced in either exhibit relied upon by Anderson in her Rule 56 brief.

Furthermore, solely through the statement provided by Anderson in her August 2010 EEOC Charge, can we presume that, in addition to Anderson, Lenington also supervised Carla Soloman ("Carla"), Solomon, Jones, and Brzana. *See Doc.* 38-10 at 4. According to Anderson, those employees are Caucasian. *Id.* Moreover, Soloman held the classification of PM 1, with no one to supervise.

44

*Doc.* 37 at ¶ 97; *Doc.* 38-2 at 215.[14]   While Jones maintained the same classification as Anderson, his job duties were different in that he not only managed a project or two, but he was also in charge of facilitators and had supervisory authority. *Id.* at ¶ 93; *Doc.* 38-2 at 215-16.  Similarly, in addition to Anderson, the only employees Brzana supervised were Mindy, Jones, and Wolfgang.  *Doc.* 37 at ¶ 89.  Wolfgang was classified as an ITGA 2, with no supervisory authority. *Id.* at ¶¶ 94-95; *Doc.* 38-2 at 215.

Given the classification and job descriptions of Anderson's known colleagues, who reported to the same supervisor(s), we find that they were not similarly-situated to her.  Other than Jones, none of those, known individuals maintained the same job classification as Anderson, and thus were not likely to be held to the same standards, or required to have the same resources and level of training as Anderson.  Regarding Jones, while we recognize that he maintained the same job classification as Anderson, in that he was also classified as an ITGA 1, *see id.* at ¶¶ 90-92, his job functions differed from hers in that he (Jones) not only managed projects but was also in charge of facilitators, having supervisory authority.  *See Doc.* 38-2 at 215-16; *see also Doc.* 38-12 at 15.  Anderson, however, was solely hired to provide "maintenance and support" on PSP projects,

---

[14]   We have also found nothing in the record to demonstrate who Feldgus supervised when she was Anderson's supervisor prior to September 2009, or, for that matter, the job classification and description of duties for any employees supervised by Feldgus.

not to supervise employees. Furthermore, as mentioned, Anderson does not point us to any evidence demonstrating that her role actually evolved into one where she should have obtained supervisory authority, or that Jones, like herself, was initially hired solely to provide support and management to projects without supervisory authority but later acquired said authority with similar qualifications and experiences. "By virtue of their differing job functions alone, [Anderson and Jones] cannot be considered similarly situated." *Morgan*, 2009 WL 5111792, at *6.

Assuming for argument's sake that Anderson could demonstrate a prima facie case that she suffered disparate treatment on the basis of her race, premised upon her suspension and failure to receive annual evaluations, we find that it would be nearly impossible for Anderson to be able to show pretext for intentional discrimination. A plaintiff may show pretext by either: (1) identifying evidence that would allow a reasonable factfinder to "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action;" or (2) by casting sufficient doubt upon the legitimate reasons proffered by the defendant so that a reasonable factfinder could conclude that the reason was a *post hoc* fabrication or else did not actually motivate the employment action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994). It is not enough for a plaintiff to demonstrate that an employer's decision was "wrong or

mistaken." *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 (3d Cir. 1999).

In relation to her suspension, Anderson quite simply does not "put up" any evidence allowing a reasonable factfinder to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendants' actions. Moreover, it is most obvious that the defendants had a legitimate non-discriminatory reason for suspending her because she confessed to having filed a false report about a hit-and-run crash in which she was involved. The same can be said about Anderson's claim that she was discriminated against in that she did not receive regular, annual EPRs. At no point has Anderson demonstrated, with sufficient admissible evidence, that similarly-situated employees outside of her protected class received regular, annual EPRs while she did not. For similar reasons, Anderson also fails to project doubt on Brzana's legitimate, non-discriminatory rationale for waiting to provide Anderson with an annual EPR, because she wanted a sufficient amount of time to assess the work of all of her subordinates.

In short, no reasonable juror could find that Anderson was subject to disparate treatment, on the basis of her race, in violation of Title VII. Summary judgment, therefore, should be entered in favor of the PSP.

### 3.  Hostile Work Environment.

In Anderson's amended complaint, we do not see where she explicitly uses the phrase "hostile work environment." *See Doc.* 13.  At least one court within the Third Circuit, however, has ruled that a plaintiff need not explicitly use that phrase to raise such a claim so long as the allegations sufficiently make out the existence of the claim.  *See Glasgow v. Veolia Water North Am. Operating Servs.*, LLC, 2010 WL 3780966, at *6 (D. Virgin Islands Sept. 21, 2010).  Where we see the hostile-work-environment claim first arise in this case is in Anderson's brief-in-opposition to the defendants' summary judgment motion.  Even there, however, it is still unclear whether Anderson is arguing that she has raised such a claim or that she is merely attempting to invoke the doctrine to overcome the limitations period under the 300-Day Rule.  *See Doc.* 51 at 7-12.  Despite the lack of clarity, the PSP has not challenged the sufficiency of the allegations in Anderson's amended complaint, nor does the PSP dispute the existence of such a claim as an argument in support of its motion for summary judgment.  Rather, the PSP treats Anderson's argument in her brief as though she raises a substantive, standalone hostile-work-environment claim, and it addresses the claim on the merits.  Specifically, the PSP argues that Anderson's hostile-work-environment claim fails because there is no evidence of severe and pervasive conduct.  *Doc.* 56 at 18-20.  Accordingly, we will

treat the hostile-work-environment claim as though it was raised in connection with Count I.

Under Title VII, it is well-established that a discrimination claim can be made upon a theory of a hostile work environment.  Such a claim is based on the idea that workplace discrimination may, in some cases, alter the terms and conditions of employment.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64–65 (2006).   As the Supreme Court recognized in *Meritor Savings Bank v. Vinson*, "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult."  477 U.S. 57, 65 (1986).

To support a Title VII discrimination claim premised upon the hostile-work-environment theory, "[Anderson] has an obligation, in opposing summary judgment, to come forward with evidence supporting a *prima facie* case."  *Griffin v. Harrisburg Property Services, Inc.*, No. 08-1655, 2009 WL 4061229, at *4 (M.D. Pa. Nov. 23, 2009).   "Specifically, [Anderson] must demonstrate: (1) [s]he suffered intentional harassment based on race; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected [her]; (4) the harassment would have detrimentally affected a reasonable person in like circumstances; and (5) there is a basis for employer liability."  *Id.* (citing *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2009), *overruled in part on other grounds by Bulington*, 548 U.S.

53 (2006)).[15]  No single factor is dispositive in a hostile-work-environment claim; however, according to the Supreme Court, "conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment … is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see also, Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990)(explaining that the plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee.").

On the second element of a hostile-work-environment claim, which the PSP contends Anderson cannot satisfy, a court should consider several factors in determining whether an environment is hostile or abusive, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; [and] whether it

---

[15]     The Third Circuit has often stated that discriminatory harassment must be "severe and pervasive." *See e.g., Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001); *West v. Phila. Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). But the Supreme Court's standard is "severe or pervasive." *Pa. State Police v. Suders*, 542 U.S. 129, 133, (2004). As the Third Circuit recognized in *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir.), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), "the difference is meaningful, and the Supreme Court's word controls." *Id.* at n. 3.  By using the disjunctive "or" the Supreme Court clearly meant that "severe" and "pervasive" are alternative possibilities. *Id.*  In other words, some conduct, although isolated and sporadic, may be severe enough to contaminate the workplace; whereas, other, less objectionable, conduct must be pervasive in order to contaminate the workplace such that it meets the threshold under the second prong of a hostile-work-environment claim. *See id.*

unreasonably interferes with an employee's work performance." *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001)(quoting *Harris*, 510 U.S. at 23). We are further mindful that Title VII should not be used to impose a "general civility code" on the workplace. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Thus, we emphasize that "offhanded comments [ ] and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (citations and internal quotation marks omitted).

Applying these principles to the matter at hand and viewing the evidence in the light most favorable to Anderson, a reasonable fact finder could not find that the environment in which Anderson worked was "permeated with discriminatory intimidation, ridicule, and insult" such as would alter the conditions of her employment. To that end, Anderson does not cite to a single incident involving the utterance of a racial epithet, the use of a racist symbol, or any direct comment concerning her race. *See Tucker v. Merck & Co.*, Inc., 131 F. App'x 852, 859 (3d Cir. 2004)(granting summary judgment on plaintiff's claim when he could not demonstrate the same). Moreover, similar to the plaintiff in *Tucker, supra,* we have already determined that Anderson has no direct evidence of discrimination and cannot make out an inference of discrimination based upon disparate acts of

racial discrimination, much less acts that could be bonded together to make out a discrimination claim on the theory of a hostile work environment. Also, Anderson's subjective disagreement, or disappointment, with the alleged acts that were taken against her while she was employed as an ITGA 1, and even her opinion that they were racially motivated or offensive, is simply insufficient as a matter of law to establish a hostile-work-environment claim. Thus, summary judgment should also be granted to the PSP on Anderson's hostile-work-environment claim. *See also, Fenter v. Mondelez Global, LLC,* 574 F. App'x 213, 217 (3d Cir. 2014)(affirming entry of summary judgment for defendant on plaintiff's hostile-work-environment claim where the evidence demonstrated that plaintiff was dissatisfied with his work assignments and associated team); *Garcia v. Newtown Township*, 819 F.Supp.2d 416, 431-32 (E.D. Pa. 2011)(entering judgment in favor of the defendants on plaintiff's hostile-work-environment claim where, *inter alia*, the evidence from the plaintiff demonstrated that her boss required her to stand at her desk while he sat in her chair; accompany him outside the building to stand in the cold while he pointed his finger at her and yelled at her; took work assignments and a training class away from her; and told her that she had to socialize more with people in the office).

### 4. Retaliation.

In Count III of her amended complaint, Anderson claims that the PSP retaliated against her through the filing of negative ratings in her annual EPRs. According to Anderson, this occurred because she had previously filed complaints of discrimination with the EEOC and the SCSC in August and September 2010, respectively. *Doc.* 13 at ¶¶ 61, 62, 112, 114. More precisely, Anderson claims that after she filed said complaints with the EEOC and SCSC, she was provided with an interim evaluation in December 2010 that contained negative statements about her work performance. *Id.* at ¶¶ 64, 68. Anderson further contends that no other PSP employees in her department received interim evaluations; evaluations, which Anderson avers, are only given to employees who are deficient in areas of their basic work duties. *Id.* at ¶ 64 n. 2, 65. Moreover, in April 2011 and 2012 Anderson claims that she then received "resoundingly negative" EPRs. *Id.* at ¶¶ 75-76, 80-81.[16]

---

[16]   We reject Anderson's argument, *Doc.* 51 at 17, that her retaliation claim encompasses acts allegedly taken against her in retaliation for having filed discrimination complaints dating back to January 2007. According to Anderson, since the filing of that particular complaint, she was allegedly subjected to "increasingly hostile and negative performance reviews, excluded . . . from training essential to continued success and advancement with [in the] PSP, and isolated her from coworkers." We do not construe the amended complaint as reasonably incorporating any of these alleged acts into her retaliation claim, and, obviously, neither did the defendants. At the same time, we are cognizant that the PSP neither addresses nor contests Anderson's retaliation claim with respect to the annual EPRs she received in April 2011 and 2012, even though, allegations exist to

Title VII's anti-retaliation provision, which is set forth in 42 U.S.C. § 2000e-3(a), states, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, assisted, or participated in any manners in an investigation, proceeding, or hearing under this subchapter.

As the Supreme Court recently provided, "[t]his enactment . . . makes it unlawful for an employer to take adverse employment action against an employee 'because' of certain criteria." *Nassar*, 133 S.Ct. at 2528. Accordingly, to make out a *prima facie* case of retaliation, a plaintiff must establish the following elements: (1) she engaged in protected activity; (2) the employer took adverse employment action after or contemporaneous with the protected activity; and (3) a causal link existed between the protected activity and the adverse action. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).[17]

---

plausibly suggest that those annual EPR ratings make up part of the retaliation claim. As such, we recommend that Anderson's Title VII retaliation claim proceed with respect to the April 2011 and 2012 EPR ratings she received.

[17] Importantly, the same three-step burden-shifting framework from *McDonnell Douglas, supra*, applies. *See Weightman v. Bank of N.Y. Mellon Corp.*, 772 F.Supp.2d 693, 703 (M.D. Pa. 2011) (citing *McDonnell Douglas*, 411 U.S. at 802, 804). Thus, once the *prima facie* case of retaliation has been established, the burden of production shifts to the employer to present a legitimate, non-retaliatory reason for the adverse employment action. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citation omitted). Then, the burden of production shifts back to the plaintiff to prove that the employer's reason was pretextual. *Id.*

In this case, the PSP does not dispute that Anderson's 2010 complaints with the EEOC and SCSC qualify as protected activities. *See Doc.* 43 at 35. The PSP, instead, first contends that Anderson cannot satisfy her burden because the EPR rating she received in December 2010 is not an adverse employment action, and Anderson cannot otherwise demonstrate that her 2010 complaints filed with the EEOC and SCSC were the "but-for" cause of the rating she received in the same EPR. *Id.* at 36, 37.

The adverse-employment-action element is focused on whether the complaining plaintiff was harassed or retaliated against in a way that might have dissuaded a reasonable employee in the plaintiff's position from making or supporting a charge of discrimination. *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). For an employer's action to satisfy the second prong of a *prima facie* case of retaliation, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (2006) (internal quotation marks omitted); *accord Moore*, 461 F.3d at 341. As such, we examine the challenged conduct "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *White*, 548 U.S. at 71 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

55

"[P]etty slights, minor annoyances, and simple lack of good manners" generally will not suffice. *Id.* at 68. However, "[c]ontext matters" such that "an act that would be immaterial in some situations is material in others." *Id.* at 69 (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005) (internal quotation marks omitted)).

According to the PSP, Anderson cannot demonstrate a genuine issue about whether her receipt of an overall "satisfactory" rating in the December 2010 EPR, with criticism about her communications skills, constitutes an adverse employment action. *Doc.* 43 at 36. In support of its argument, *id*, the PSP submits that the Third Circuit's non-precedential, *per curiam* opinion, in *Ponton v. AFSCME*, 395 F. App'x 867 (3d Cir. 2010), is instructive.

In *Ponton*, the plaintiff alleged that he received "a negative performance evaluation [in retaliation] for testifying before the Civil Service Commission." *Id.* at 874. In affirming the district court's grant of summary judgment in favor of the defendant, the Third Circuit stated:

> [W]e agree with the [defendant] that the evaluation did not constitute a materially adverse action inasmuch as [plaintiff] received an overall rating of "satisfactory," the highest rating available. *See Moore*, 461 F.3d at 341. While the evaluation did note that there were occasions when [plaintiff] refused to "follow directives," the record does not reasonably support a finding that the evaluation overall was materially adverse.

*Ponton*, 395 F. App'x at 874.

In comparison, in this case, the overall "satisfactory" rating Anderson received in the December 2010 interim evaluation was not the highest rating available to her. As mentioned previously, *supra,* on the EPR forms, an examiner could insert any of the following marks from highest to lowest: "outstanding," "commendable," "satisfactory," "needs improvement," and "unsatisfactory" (respectively from highest to lowest). *See, e.g., Doc.* 38-3 at 30. Thus, in some circumstances, it may be reasonable for a juror to conclude that this average rating would deter a reasonable employee from making a charge of discrimination. But here, we are unaware of record evidence that would permit a reasonable juror to draw that inference, even with the negative comments about Anderson's communications skills. For example, we are not aware of any evidence explaining how such an overall rating, with negative commentary, tangibly affected, or could have affected, Anderson's employment status, including her prospects for promotions and future employment. To the contrary, the evidence to which we have been pointed reflects that Anderson was not at all penalized for said ratings or commentary, and we are in the dark as to whether the ratings and commentary hampered Anderson's opportunity to work on new projects or her prospects for a promotion.[18] Consequently, summary judgment should be entered in favor of the

---

[18] In her amended complaint, Anderson also avers that certain positions excluded applicants who did not have overall performance ratings of "satisfactory" or better, and that the majority of managerial positions required applicants to have

PSP on Anderson's retaliation claim involving the interim EPR rating she received in December 2010.

### B. Supplemental Jurisdiction and Anderson's PHRA Claims.

In light of the aforementioned recommendations, only Anderson's Title VII retaliation claim premised upon her April 2011 and 2012 EPRs, her state-law claim for retaliation in Count IV, and her state-law claim for aiding and abetting race discrimination in Count V remain. We must, therefore, analyze whether the Court should exercise supplemental jurisdiction over Anderson's remaining state-law claims.

In pertinent part, 28 U.S.C. § 1367, which establishes the supplemental jurisdiction of the Federal District Courts, provides:

> Except as provided in subsection[] … (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). In turn, § 1367 (c), provides that district courts may decline to exercise supplemental jurisdiction over a claim under Subsection (a) if:

---

the same overall rating. *Doc.* 13 at ¶¶ 87-88. Here, Anderson received an overall "satisfactory" rating.

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1)-(4).

The only federal claim that should proceed is Anderson's Title VII retaliation claim against the PSP stemming from her April 2011 and 2012, annual, EPRs. Said federal claim gives rise to the Court's original jurisdiction pursuant to 28 U.S.C. § 1331. At this juncture, the supplemental-jurisdiction statute requires us to analyze whether Anderson's state-law claims are part of the same Article III "case or controversy" as the aforementioned Title VII claim. This standard was explained by the Supreme Court in *United Mine Workers of America v. Gibbs*.

In *Gibbs*, the Supreme Court established three requirements that must be satisfied:

> The federal claims must have substance sufficient to confer subject-matter jurisdiction on the court. The state and federal claims must derive from a common nucleus of operative fact. But if considered without regard to their state or federal character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in the federal courts to hear the whole.

383 U.S. 715, 725 (1966) (footnote and internal citation omitted).  Pursuant to this line of reasoning, a district court may not assert supplemental jurisdiction over claims that are totally unrelated to the federal claims that form the basis of the Court's jurisdiction.  *In re: Prudential Ins. Co. Am. Sales Prac. Litigation Agent Actions*, 148 F.3d 283, 302 (3d Cir. 1998)(citation omitted).  Moreover, the Third Circuit has explained that "§ 1367 does not permit courts to take jurisdiction over tangentially related claims."  *Id.* at 303.

With respect to Anderson's retaliation claim brought pursuant to the PHRA, we have little difficulty recommending, as a matter of law, that the Court has authority to exercise supplemental jurisdiction over a portion of said claim, namely the claim that asserts retaliation in connection with her April 2011 and 2012 annual EPRs.  The PHRA retaliation claim appears to be premised upon the same facts and evidence as the Title VII retaliation claim, and the two claims appear to derive from a common nucleus of operative fact.

For similar reasons, the same should hold true on Anderson's PHRA claim for aiding and abetting discrimination, but only as to Brzana and the PSP.  The relevant provision of the PHRA provides that it is an unlawful discriminatory practice:

> For any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

43 P.S. § 955(e). Under this aiding-and-abetting provision, "[a] PHRA plaintiff may advance … liability claims against [persons] who bear responsibility for implementing an allegedly unlawful discriminatory practice." *D'Altilio v. Dover Twp.*, No. 06–1931, 2009 WL 2948524, at *12 (M.D. Pa. Sept. 14, 2009); *see also Carlton v. City of Phila.*, No. 03–1620, 2004 WL 633279 (E.D. Pa. Mar. 30, 2004) (stating that supervisory employees can be held liable as an aider and abettor based upon "the theory that . . . [they] share the discriminatory purposes and intent of the employer."). Having recommended that Anderson's Title VII retaliation claim proceed with respect to her April 2011 and 2012, annual EPRs, and that the undisputed evidence demonstrates that Brzana issued said EPR ratings, a reasonable juror could conclude that if Anderson succeeded on the Title VII retaliation claim against the PSP, she could likewise recover under 43 P.S. § 955(e) against the PSP in addition to Brzana. In all other respects, however, the Court should decline to exercise supplemental jurisdiction on Anderson's PHRA claim under § 955(e) as there is not only a lack of evidence demonstrating that Noonan,

Lenington, and Shevlin aided or abetted Brzana, but also because judgment should be entered in favor of the PSP on the other discriminatory acts in which these defendants were allegedly involved and said acts are only tangentially related to the sole remaining Title VII retaliation claim.

## V.      **Recommendation.**

For the foregoing reasons, **WE RECOMMEND** that:

(1) The defendants' summary judgment motion (*Doc.* 36) be **GRANTED** in part and **DENIED** in part as follows:

    a.  The motion should be **GRANTED** to the extent that Anderson fails to demonstrate a genuine dispute with respect to her Title VII and PHRA claims for (1) disparate treatment discrimination; (2) hostile work environment; and (3) retaliation based on her December 2010, annual, EPR.

    b.  The motion should be **DENIED** to the extent that the defendants fail to successfully argue that supplemental jurisdiction should not be extended over Anderson's PHRA claims.   In this regard, we have determined that the PSP did not address Anderson's Title VII retaliation claims involving her April 2011 and 2012, annual EPRs. Accordingly, that specific portion of her retaliation claim should proceed under Title VII and the PHRA.  In a similar vein, because the

defendants did not address the same portion of Anderson's Title VII

retaliation claim, her claim under the PHRA for aiding and abetting

should also proceed, but solely against the PSP and Brzana.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter
> described in 28 U.S.C. § 636 (b)(1)(B) or making a
> recommendation for the disposition of a prisoner case or a
> habeas corpus petition within fourteen  (14) days after being
> served with a copy thereof. Such party shall file with the clerk of
> court, and serve on the magistrate judge and all parties, written
> objections which shall specifically identify the portions of the
> proposed findings, recommendations or report to which objection
> is made and the basis for such objections. The briefing
> requirements set forth in Local Rule 72.2 shall apply. A judge
> shall make a de novo determination of those portions of the
> report or specified  proposed findings or recommendations to
> which objection is made and may accept, reject, or modify, in
> whole or in part, the findings or recommendations made by the
> magistrate judge. The judge, however, need conduct a new
> hearing only in his or her discretion or where required by law,
> and may consider the record developed before the magistrate
> judge, making his or her own determination on the basis of that
> record. The judge may also receive further evidence, recall
> witnesses or recommit the matter to the magistrate judge with
> instructions.

> Failure to file timely objections to the foregoing Report and
> Recommendation may constitute a waiver of any appellate rights.

Submitted this **6th** day of **March 2015**.

*S/ Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge